IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| FRANKENMUTH MUTUAL INSURANCE COMPANY, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) 1:19-CV-1125<br>) |
| CADET CONSTRUCTION COMPANY; CADET LOGISTICS, LLC; and CHARETTE J. MILLER, | )<br>)<br>)<br>) |
| Defendants. | )<br>) |

## MEMORANDUM OPINION AND ORDER

Catherine C. Eagles, District Judge.

Frankenmuth Mutual Insurance Company is the surety for payment and performance of a construction contract between defendant Cadet Construction Company and the Federal Aviation Administration. It has sued Cadet and the other defendants for breach of a General Agreement of Indemnity the defendants signed in order to obtain Frankenmuth's services as surety.

Frankenmuth moved for a preliminary injunction ordering defendants Cadet Construction Company, Cadet Logistics, LLC, and Charette Miller to produce books and records and to provide collateral security, both of which Frankenmuth contends are required by the General Agreement of Indemnity. The Court previously granted the motion to the extent it sought to require the defendants to produce books and records. Doc. 34. Because Frankenmuth has met the requirements for a preliminary injunction requiring defendants to deposit collateral security, its motion will be granted.

## Findings of Fact

Frankenmuth has issued surety bonds on behalf of Cadet on multiple construction projects, Doc. 21 at ¶ 7, including payment and performance bonds for Cadet's construction project for the Federal Aviation Administration known as the "GSO ASR Shelter Replacement Project." *Id.* at ¶ 8–11, Doc. 25 at ¶ 7. Under the payment bond, Frankenmuth and Cadet are jointly and severally bound to the FAA in the amount of $4,599,900 to make payment to all subcontractors and suppliers who provide labor or materials in connection with the GSO ASR project. Doc. 21 at ¶ 11. Under the performance bond, Frankenmuth and Cadet are jointly and severally bound to the FAA in the amount of $4,599,900 for the full performance of the GSO ASR project contract. *Id.* at ¶ 10.

As a condition of the issuance of these and other bonds, the defendants each signed an indemnification agreement with Frankenmuth. Doc. 1 at ¶¶ 8–12; Doc. 1-1. In that agreement, each defendant agreed "to deposit with [Frankenmuth], upon demand, funds, other collateral security acceptable to [Frankenmuth], in an amount as determined by [Frankenmuth] sufficient to discharge any Loss or anticipated Loss." Doc. 1-1 at ¶ 5. "Loss" is defined by the contract as, *inter alia*, all "loss, costs and expense of any kind or nature, including attorneys' and other fees or costs, which [Frankenmuth] incurs in connection with any Bond, Contract, or this Agreement . . . ." *Id.* at 2. It specifically includes expenses incurred in "making any investigation in connection with any Bond" or incurred by reason of a claim "which may constitute, lead to or result in Loss, liability, or asserted liability . . . ." *Id.* The agreement also provides that once Frankenmuth's

2

liability has been resolved, any remaining funds deposited by the defendants and held by Frankenmuth are to be returned. *Id.* at ¶ 5.

In April 2019, the FAA expressed concern about Cadet's ability to complete the GSO ASR project. Doc. 21 at ¶ 12. In May 2019, the FAA's contracting officer told Frankenmuth via email that Cadet was "not going to be able to complete this contract until sometime in November" even though the current end date was in July, and that "[a]s such, we feel the risk of this contract not being completed on time is high." Doc. 21-2. The FAA asked about Frankenmuth's coverage if Cadet was terminated for default. *Id.*

Within days, Frankenmuth contacted the defendants in response to the FAA's email, telling the defendants that because "Cadet is not adequately staffing the project and is significantly behind schedule, . . . Frankenmuth is exposed to loss and expense" under the performance and payment bonds "in an amount up to and including the penal sum of the bond of $4,599,900.00." Doc. 21-3. Frankenmuth demanded that the defendants furnish collateral in that amount and stated its intention to investigate its risks and costs of project completion. *Id.*

Sometime between August and October of 2019, in response to Frankenmuth's demand, Cadet established an escrow account for the benefit of and controlled by Frankenmuth. *Compare* Doc. 25 at ¶ 9 *with* Doc. 28 at ¶ 7. Cadet's evidence is that it has deposited all payments made on the GSO ASR project since that date into that account, Doc. 25 at ¶ 9, but there is no evidence of how much money, if any, has been deposited into the escrow account. No party has pointed to any evidence showing that the defendants otherwise complied with Frankenmuth's demand to provide collateral.

3

In February of 2020, Frankenmuth established a loss reserve of $400,000 in order to cover claims against the payment bonds and for expenses incurred by Frankenmuth on Cadet projects. Doc. 28 at ¶ 8. As of April 20, 2020, Frankenmuth had paid $106,460.64 to Cadet subcontractors for labor and materials furnished on Cadet projects bonded by Frankenmuth, including paying one of Cadet's subcontractors $69,115 for work done in connection with the GSO ASR project. *Id.* at ¶ 9. Frankenmuth has made multiple demands for reimbursement for these payments, but the defendants have failed to reimburse Frankenmuth for any portion. *Id.*

On March 23, 2020, the FAA terminated Cadet from the GSO ASR project, Doc. 28-1, and told Cadet that "your company will be held liable for any excess costs occasioned" by completing the project with another contractor. *Id.* at 1–2. The FAA provided a copy of the termination letter to Frankenmuth and asked Frankenmuth for its "plan of action to remedy" Cadet's breach. Doc. 28-2.

At a minimum, Frankenmuth has exposure on the bonds for $2,425,669.47, which Cadet acknowledges is "the current balance to complete the [GSO ASR] Project." Doc. 25 at ¶ 10. Under the performance bond, Frankenmuth is potentially liable to the FAA up to the full penal sum of the performance bond, $4,599,900. Doc. 28 at ¶ 6; Doc. 21 at ¶ 10. It is also incurring expenses to determine the anticipated cost to complete the project as of the time of the default. Doc. 28 at ¶ 6.

Cadet's financial situation is precarious. At least five parties (including Frankenmuth) claim to have a secured interest in Cadet's assets, Doc. 25-3 at ¶ 68; the priority of these creditors is uncertain, *id.* at ¶ 70–71; and Cadet is involved in multiple

4

lawsuits and pre-litigation disputes. *Id.* at ¶ 72. Cadet has had difficulties paying its employees and its sloppy bookkeeping and poor maintenance of financial records make it difficult to make a complete assessment of Cadet's stability. *See generally* Doc. 25-3.

Frankenmuth filed suit in November 2019 for breach of contract. Doc. 1. It moved for a preliminary injunction on February 18, 2020. Doc. 19.

## Conclusions of Law

To obtain a preliminary injunction, a party must show that: (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm if the injunctive relief is denied, (3) the balance of equities tips in its favor, and (4) injunctive relief would be in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *United States v. South Carolina*, 720 F.3d 518, 533 (4th Cir. 2013). "Satisfying these four factors is a high bar, as it should be." *SAS Inst., Inc. v. World Programming Ltd.*, 874 F.3d 370, 385 (4th Cir. 2017), *cert. denied*, 139 S. Ct. 67 (2018).

Frankenmuth is likely to succeed on the merits. Under North Carolina law,[1] "[t]he elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." *Montessori Children's House of Durham v. Blizzard*, 244 N.C. App. 633, 636, 781 S.E.2d 511, 514 (2016).[2] To obtain the remedy of

---

[1] The parties cite to North Carolina law in their briefs, *see, e.g.*, Doc. 20 at 11; Doc. 24 at 5, but the General Agreement of Indemnity provides that Maine law shall govern all disputes arising out of the contract. Doc. 1.1 at ¶ 29. Maine contract law does not appear to substantively differ from North Carolina contract law as is relevant to this motion. *See York Cty. v. PropertyInfo Corp.*, 200 A.3d 803, 807–08 (Me. 2019) (analyzing elements for breach of contract claim).

[2] The Court omits internal citations, alterations, and quotation marks throughout this opinion, unless otherwise noted. *See United States v. Marshall*, 872 F.3d 213, 217 n.6 (4th Cir. 2017).

5

specific performance for the breach, the plaintiff "must show the existence of a valid contract, its terms, and either full performance on his part or that he is ready, willing and able to perform." *Ball v. Maynard*, 184 N.C. App. 99, 107, 645 S.E. 2d 890, 896 (2007), *review denied* 656 S.E. 2d 591 (2007).

Frankenmuth has offered evidence that the General Agreement of Indemnity is a valid contract between Frankenmuth and each of the three defendants, and the defendants have offered no contrary evidence. Frankenmuth has offered evidence that the contract requires the defendants to "to deposit with [Frankenmuth], upon demand, funds, other collateral security acceptable to [Frankenmuth], in an amount as determined by [Frankenmuth] sufficient to discharge any Loss or anticipated Loss," Doc. 1-1 at ¶ 5, and the defendants have offered no contrary evidence. Frankenmuth has offered evidence that it demanded that the defendants deposit collateral in the amount of $4,5999,900 by May 30, 2019, and that the defendants failed to comply. Doc. 21-3. While the defendants have offered evidence that they established an escrow account under Frankenmuth's control, Doc. 25 at ¶ 9, they offered no evidence of the amount of money deposited into that account and they do not deny that they failed to provide security in the requested amount. It is also undisputed that the defendants have failed to reimburse Frankenmuth for the $69,115 Frankenmuth paid one of the subcontractors on the GSO ASR project.

Despite this undisputed evidence, the defendants contend they have not breached the indemnity agreement because, they assert, Frankenmuth has not suffered a "Loss" and has not provided evidence of an "anticipated Loss." They contend that Frankenmuth

6

provided no evidence that claims have been made against Frankenmuth related to the bonds and that they have not breached the contract with the FAA. Doc. 24 at 6–7.

The Court need not decide whether the defendants' arguments might have prevailed if the facts remained as they were when Frankenmuth filed its motion for a preliminary injunction. By the time the defendants filed their response, a new event had occurred, changing the calculus significantly: the day before the defendants filed their response, the FAA terminated Cadet from the GSO ASR project for default. The defendants inexplicably fail to mention this fact, much less to address it, in their brief in opposition to the preliminary injunction.[3] After Frankenmuth brought this fact to the Court's attention as part of their reply brief and evidence, the defendants did not dispute the fact of termination or seek to provide additional evidence.

The collateral security provision of the General Agreement of Indemnity expressly allows Frankenmuth to demand a collateral security deposit from the defendants "in an amount as determined by [Frankenmuth] sufficient to discharge any Loss or anticipated Loss." Doc. 1-1 at ¶ 5. The contract does not impose any conditions on Frankenmuth's ability to demand a collateral security deposit, and it does not have to prove the amount of the loss or anticipated loss to Cadet's satisfaction before Cadet and the other indemnitors have to make the deposit. The contract says that Frankenmuth is entitled to

---

[3] The declaration of Cadet's Vice President, Mr. Dillahunt, was signed and filed on March 24, 2020, the day the defendants' brief in opposition was also filed. Doc. 25. The evidence shows that the FAA sent the termination letter by email to Mr. Dillahunt at 8:28 a.m. on March 23, *see* Doc 28-2 at 1–2, so Mr. Dillahunt and Cadet knew about the termination at the time he signed the declaration and at the time the brief was filed on the defendants' behalf.

7

Case 1:19-cv-01125-CCE-JLW   Document 36   Filed 05/11/20   Page 7 of 12

determine the amount. *Id.* While no doubt there is a good faith component to this requirement, there is no evidence to indicate that Frankenmuth does not have a reasonable belief it is on the hook to the FAA for a substantial sum of money. Indeed, the FAA has asked Frankenmuth how it intends to "remedy" Cadet's breach, Doc. 28-2, and any such remedy will obviously require money.

Moreover, the contract defines the word "Loss" very broadly. It does cover the amount of any claim made on the bonds, Doc. 1-1 at 2, but it also includes expenses Frankenmuth incurs to investigate; attorneys' fees incurred in enforcing the agreement; and any claim which "may" result in "liability or asserted liability." *Id.* The FAA's early communications back in April and May of 2019 clearly indicated its belief that Cadet was in breach and behind schedule, thus giving rise at a minimum to expenses on Frankenmuth's part to investigate their potential liability. And Frankenmuth has established a $400,000 loss reserve to cover claims and has already paid $69,115.00 to one of Cadet's subcontractors on the GSO ASR project. Doc. 28 at ¶¶ 8–9. Furthermore, as discussed in the Court's earlier preliminary injunction order, Doc. 34, Cadet unjustifiably refused to comply with Frankenmuth's contractual right to demand to inspect and audit Cadet's books, necessitating this litigation to compel compliance.

Courts have often enforced collateral security provisions at the preliminary injunction stage under appropriate circumstances. *See, e.g., Int'l Fidelity Ins. Co. v. Waterfront Grp. NC, LLC*, No. 3:11-cv-00116-W, 2011 WL 4715155, at *2–5 (W.D.N.C. Oct. 6, 2011); *First Nat'l Ins. Co. v. Sappah Bros., Inc.*, 771 F. Supp. 2d 569, 571–76 (E.D.N.C. 2011). Here, Frankenmuth has shown that it is at substantial risk of liability

8

on the bonds issued on behalf of Cadet, that the indemnity agreement requires the defendants to post collateral security for such anticipated losses upon demand by Frankenmuth, and that the defendants have failed to post that collateral security. Thus Frankenmuth has demonstrated a likelihood of success on the merits of its claim that defendants have breached the collateral security provision.

Frankenmuth is likely to suffer irreparable harm absent injunctive relief. "Courts routinely recognize that a surety's loss of its right to collateralization cannot be adequately remedied through monetary damages." *Sappah*, 771 F. Supp. 2d at 574 (collecting cases). Frankenmuth "holds a bargained-for right to collateral security and, without enforcement of such right, assumes the risk of becoming a general unsecured creditor and of being unable to collect a subsequent judgment in its favor." *See Waterfront Grp. NC*, 2011 WL 4715155, at *5. The contract itself contains an agreement by the defendants that Frankenmuth "would suffer irreparable damage and would not have an adequate remedy at law" if Cadet did not comply with the collateral security provision. Doc. 1-1 at ¶ 5. As noted *supra*, the FAA has terminated Cadet from the GSO ASR project, Frankenmuth already has out-of-pocket expenses from paying a subcontractor Cadet failed to pay, along with additional exposure up to the contract amount, and it has already incurred expenses and fees to investigate and manage the FAA's claims.

The possibility of a judgment at a later time is unlikely to protect Frankenmuth. Cadet's financial state is precarious, it has other unsecured creditors, and there are serious doubts about its ability to satisfy a judgment in the future. Absent an ability to collect on

9

a final judgment, Frankenmuth is likely to suffer irreparable harm. *See Waterfront Grp. NC*, 2011 WL 4715155, at *4–5 (finding irreparable harm where plaintiff "raised sufficient doubt" about whether the defendant could satisfy a monetary judgment).

That said, it is not clear that Frankenmuth will suffer irreparable harm unless the defendants post the full amount of $4,599,900.00 which Frankenmuth demanded last year, Doc. 21-3, and which it seeks in its motion for a preliminary injunction. Doc. 19 at 3. While the evidence arguably would support an order requiring the defendants to post the full contract amount, and it certainly supports an order requiring the defendants to post $2,425,669.47, which Cadet acknowledges is "the current balance to complete the [GSO ASR] Project," Doc. 25 at ¶ 10, the Court concludes that a lesser amount will prevent irreparable harm to Frankenmuth.

Frankenmuth has set a reserve for its obligations of $400,000, and it has already paid out $69,115 in connection with the GSO ASR project. Doc. 28 at ¶¶ 8–9. Using Frankenmuth's own reserve figure and its out of pocket costs associated with the GSO ASR project to date, requiring the defendants to post collateral security in the sum of $469,115 seems adequate, on this record, to protect Frankenmuth from irreparable harm.

The balance of equities also favors Frankenmuth. Absent preliminary relief, Frankenmuth "would bear the entire loss on the bond claims without being collateralized, a right to which it explicitly bargained in the indemnity agreement." *Sappah*, 771 F. Supp. 2d at 575. Granting the motion merely requires the defendants to do what they are contractually obligated to do.

Finally, there is a public interest in enforcing a valid contract. *Id.* at 576. There is also an important public interest in enforcing a collateral security provision in the construction context: "to encourage sureties to continue to provide bonds for public construction contracts." *Id.* A preliminary injunction furthers these interests and supports the award of a preliminary injunction.

Frankenmuth has shown a likelihood of success on the merits of its claim that the defendants have breached the requirement in the contract to post collateral security upon demand; it is likely to suffer irreparable harm if the injunctive relief is denied; the balance of equities tips in Frankenmuth's favor; and injunctive relief is in the public interest. Having met the high bar required to obtain injunctive relief, Frankenmuth is entitled to a preliminary injunction requiring the defendants to comply with their contractual obligation to post collateral security in the sum of $469,115. Should Frankenmuth come into possession of additional information and evidence about its exposure as events develop which indicate this amount is insufficient to protect Frankenmuth from irreparable harm, Frankenmuth can move to modify the injunction.

Finally, Rule 65(c) of the Rules of Civil Procedure specifies that a "court may issue a preliminary injunction . . . only if the movant gives security." Fed. R. Civ. P. 65(c); *Pashby v. Delia*, 709 F.3d 307, 331–32 (4th Cir. 2013). The bond protects the defendants should it later be determined that the injunction was wrongfully issued. Neither party addressed an appropriate bond amount in the briefing.

The Court must determine the amount of a bond based on record evidence. *Lab. Corp. of Am. Holdings v. Kearns*, 84 F. Supp. 3d 447, 465 (M.D.N.C. 2015). That said,

11

the amount of the bond is within the Court's discretion. *Pashby*, 709 F.3d at 332; *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.,* 174 F.3d 411, 421 (4th Cir. 1999). Considering that Frankenmuth is already out of pocket for some funds, and it is contractually required to return any unused funds to Cadet, the Court finds in its discretion that a bond of $100,000 is sufficient to protect the defendants' interests.

It is **ORDERED** that the plaintiff's motion for a preliminary injunction, Doc. 19, is **GRANTED in part,** and defendants will be ordered to deposit with Frankenmuth the sum of $469,115 within five business days. A separate injunction will be entered.

This the 11th day of May, 2020.

_____
UNITED STATES DISTRICT JUDGE